**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE | : | Chapter 9 |
| | : | |
| CITY OF CHESTER, | : | |
| | : | **Bankruptcy No. 22-13032-AMC** |
| DEBTOR. | : | |
| _____ | : | |
| | : | |
| CITY OF CHESTER, | : | |
| | : | **Adv. Proc. No. 22-00084-AMC** |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | |
| | : | |
| PHCC LLC D/B/A PRESTON HOLLOW | : | |
| COMMUNITY CAPITAL, ET AL., | : | |
| | : | |
| DEFENDANTS. | : | |
| | : | |
| _____ | : | |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

### I.    INTRODUCTION

In this adversary proceeding initiated by Chapter 9 debtor, the City of Chester,

Pennsylvania ("City") against PHCC, LLC, d/b/a Preston Hollow Community Capital ("PHCC")

and Preston Hollow Capital, LLC (together with PHCC, "Preston Hollow"), the holders of

certain bonds issued by the City prepetition; U.S. Bank Trust Company, National Association,

the indenture trustee ("Indenture Trustee") tasked with assuring repayment of those bonds and

other obligations of the City; and the County of Delaware, Pennsylvania ("Delaware County"), a

creditor by virtue of a prepetition contribution agreement between it and the City to assist with

financing the construction of a soccer stadium in Chester, Pennsylvania, the City seeks the

turnover of certain revenues received by the Indenture Trustee prepetition and to avoid the

1

security interests of Preston Hollow, the Indenture Trustee, and Delaware County in certain revenues due to the City described in more detail in this Opinion.

The Court must now resolve cross-motions for summary judgment filed by the City, Preston Hollow and the Indenture Trustee, and Delaware County. Ultimately, the plain language of the operative trust indenture document clearly obligates the Indenture Trustee to turn over to the City the revenues it seeks. Additionally, while the security interests of Preston Hollow, the Indenture Trustee, and Delaware County in certain revenues due to the City are properly perfected, those security interests do not attach postpetition by virtue of § 552(a) of the Bankruptcy Code. Therefore, the City's motion for summary judgment will be granted in all respects.

## II.      FACTS AND PROCEDURAL HISTORY

### A. 2009 Contribution Agreement with Delaware County

By way of background, in 2009, Delaware County issued certain General Obligation Bonds, Series 2009, in the original principal amount of $28,595,000 ("2009 Bonds") to raise funds to help finance the construction of Subaru Park in Chester, Pennsylvania. Case No. 22-84 ECF Doc. ("ECF") 123 at 3, Ex. A-1. On January 16, 2009, the City Council of Chester ("City Council") enacted an ordinance ("2009 Ordinance") authorizing the City to incur debt and pay certain funds to Delaware County to help finance this project. Case No. 22-84 ECF 101, Ex. A-1. The 2009 Ordinance also purports to grant Delaware County a security interest in certain revenues, herein called the "Harrah's Revenues,"[1] payable to the City on a quarterly basis by the Pennsylvania Department of Revenue ("PA DOR"). *Id.* at § 6.

---

[1] Harrah's Philadelphia Casino and Racetrack ("Harrah's") operates a horse racing facility in Chester, Pennsylvania. Pursuant to § 1403(c)(3)(iii) of the Pennsylvania Race Horse and Development Gaming Act ("Gaming Act"), Harrah's is required to pay an "annual slot machine license operation fee" into a state gaming fund, a portion of

On February 15, 2009, the City and Delaware County executed a contribution agreement

("Contribution Agreement") whereby the City agreed to pay a portion of Delaware County's

annual debt service obligations under the 2009 Bonds. Case No. 22-84 ECF 101, Ex. A-2

("Contribution Agreement"). The Contribution Agreement also purports to grant Delaware

County a security interest in the Harrah's Revenues. *Id.* at § 4.01. On February 18, 2009,

Delaware County filed a UCC-1 Financing Statement ("2009 Financing Statement") in

connection with the Contribution Agreement with the Pennsylvania Secretary of the

Commonwealth ("PA SOC"). Case No. 22-84 ECF 101, Ex. A-5.

### B. 2017 Bonds and the Trust Indenture

On July 26, 2017, the City Council enacted an ordinance ("2017 Ordinance") authorizing

the City to incur additional debt in the form of two new series of bonds. Case No. 22-84 ECF

130, Ex. A-1 ("2017 Ordinance"). The 2017 Ordinance purports to grant a security interest in

certain revenues payable to the City for the benefit of an indenture trustee, including the Harrah's

Revenues discussed above, the Harrah's Table Game Revenues,[2] and the Host Community

Revenues.[3] *Id.* at § 6.

Subsequently, the City issued two series of bonds: (1) the Series 2017A Guaranteed

Revenue Bonds in the original principal amount of $12,000,000 ("Series 2017A Bonds"), and (2)

the Series 2017B Guaranteed Revenue Bonds in the original principal amount of $7,210,000

---

which is paid to the City. 4 PA. C.S.A § 1403(c)(3)(iii). The term "Harrah's Revenues" shall be used herein to describe the revenues payable to the City pursuant to § 1403(c)(3)(iii) of the Gaming Act.

[2] The term "Harrah's Table Game Revenues," as used herein, refers to revenues payable to the City and derived from table games at Harrah's horse racing facility in Chester, Pennsylvania, pursuant to § 1363(c)(2) of the Gaming Act. *See* 2017 Ordinance at 3; 4 PA. C.S.A. § 1363(c)(2).

[3] The term "Host Community Revenues," as used herein, refers to revenues payable to the City pursuant to an agreement dated January 30, 1989 ("Host Community Agreement") among the City, Delaware County, and Westinghouse Electric Corporation ("Westinghouse") wherein the City approved the development of a solid waste disposal, electric power generating and resource recovery facility in Chester, Pennsylvania. Covanta Delaware Valley, L.P. is the assignee of Westinghouse's rights and obligations under the Host Community Agreement. *See* 2017 Ordinance at 3.

("Series 2017B Bonds," collectively with the Series 2017A Bonds, "2017 Bonds"). Case No. 22-84 ECF 123 at 4–5.

On August 1, 2017, the City and U.S. Bank, National Association ("U.S. Bank") executed an indenture of trust ("Trust Indenture") in connection with the 2017 Bonds. Case No. 22-84 ECF 123, Ex. 12 ("Trust Indenture"). The Trust Indenture purports to grant U.S. Bank as indenture trustee a security interest in the Harrah's Revenues, Harrah's Table Game Revenues, Host Community Revenues, and "Additional City Consideration"[4] (collectively, "Pledged Revenues"). *Id.* at § 5.01. On August 31, 2017, U.S. Bank filed a UCC-1 Financing Statement ("2017 Financing Statement") in connection with the 2017 Bonds with the PA SOC. Case No. 22-84 ECF 130, Ex. A-24. On June 14, 2022, U.S. Bank subsequently filed a UCC-3 Amendment ("2022 Amendment") assigning the 2017 Financing Statement to the Indenture Trustee and a UCC-3 Continuation Statement ("2022 Continuation Statement," collectively with 2009 Financing Statement, 2017 Financing Statement and 2022 Amendment, "Financing Statements"). Case No. 22-84 ECF 130, Ex. A-25; A-26.

Pursuant to the Trust Indenture, the Indenture Trustee established a revenue fund ("Revenue Fund") which is comprised of separate bank accounts for certain revenues, including the Harrah's Revenues, the Harrah's Table Game Revenues, and the Host Community Revenues. Trust Indenture § 5.02. On August 31, 2017, the City sent letters ("Direction Letters") to the PA DOR and Covanta Delaware Valley, L.P. ("Covanta," collectively with the PA DOR, the "Payors") irrevocably directing the Payors to transmit the Pledged Revenues directly to the Indenture Trustee. Case No. 22-84 ECF 130, Ex. A-9. The Indenture Trustee is required to

---

[4] "Additional City Consideration" is defined as "all revenues payable to or to be received by the City [from Harrah's] pursuant to the Amended and Restated Additional Consideration Agreement dated October 1, 2011 (and any amendments or supplements thereto), between Harrah's and the Redevelopment Authority of the County of Delaware, and including the corresponding deed." Trust Indenture § 1.03.

distribute the Pledged Revenues to various parties, including Delaware County and Preston Hollow, in accordance with § 5.02 of the Trust Indenture ("Section 5.02").

Pursuant to Section 5.02(e) of the Trust Indenture, the Indenture Trustee is also required to periodically return certain funds to the City, herein referred to as the "Excess Funds." The Indenture Trustee is required to establish a 2017A Sinking Fund Account and a 2017B Sinking Fund Account (collectively, the "Sinking Fund Accounts"). Trust Indenture § 5.04. The Trust Indenture provides that, once the amounts in the Sinking Fund Accounts are sufficient to pay the principal and interest due for the 2017 Bonds on the next succeeding Interest Payment Date,[5] the Indenture Trustee shall transfer any Pledged Revenues or other funds deposited in the Revenue Fund to an account specified in writing by the City. Trust Indenture § 5.02(e).

On November 10, 2022 ("Petition Date"), following decades of economic hardship, the City filed a voluntary petition for bankruptcy relief under Chapter 9 of the Bankruptcy Code.[6] Case No. 22-13032 ECF 1. As of the Petition Date, the total outstanding balance on the Series 2017A and Series 2017B Bonds was $9,149,365 and $6,107,250, respectively, and the City's annual obligation on account of the 2009 Contribution Agreement totaled $343,483. Case No. 22-84 ECF 123 ("City Memo. of Law in Supp. of Mot. for Summ. Judg.") 4-5.

On the Petition Date, the Indenture Trustee held $4,445,242.41 in the Revenue Fund. City Memo. of Law in Supp. of Mot. for Summ. Judg. 9; Case No. 22-84 ECF 125-2 ("Bond Parties' St. of Undisputed Facts") ¶ 24. At that time, the next Interest Payment Date under the 2017 Bonds was February 15, 2023, at which point approximately $1,488,218.25 was due pursuant to the 2017 Bonds and to satisfy other requirements of the Trust Indenture. City Memo. of Law in

---

[5] The Trust Indenture states that the "'Interest Payment Date' shall be February 15 and August 15 commencing February 15, 2018, for the 2017 Bonds." Trust Indenture § 1.03.

[6] The City's petition was filed through its receiver appointed under the Municipalities Financial Recovery Act of July 10, 1987, P.L. 246, No. 47 ("Act 47"), Michael Doweary. Case No. 22-13032 ECF 1.

Supp. of Mot. for Summ. Judg. 9. Therefore, as of the Petition Date, the Indenture Trustee held

at least $2,957,024.16 in Excess Funds that was available for distribution to the City pursuant to

Section 5.02(e) of the Trust Indenture, herein referred to as the "Prepetition Excess Funds." *Id.*

On the Petition Date, the City commenced this adversary proceeding. Case No. 22-84, ECF 1.

On February 13, 2023, the City filed an amended complaint ("Second Amended Complaint").

Case No. 22-84 ECF 54 ("Second Am. Compl."). In the Second Amended Complaint, the City

asserted claims against Preston Hollow, the sole holder of the 2017 Bonds; the Indenture

Trustee; Delaware Valley Regional Finance Authority ("Finance Authority"); Delaware County;

Covanta; and Chester Downs and Marina, LLC d/b/a Harrah's Philadelphia Casino and

Racetrack ("Harrah's").[7] *Id.*

      In Count I (Declaratory Judgment), the City asks this Court to enter an order declaring

that the Pledged Revenues payable to the City after the Petition Date do not qualify as "special

revenues" under the Bankruptcy Code and therefore, under § 552(a), are not subject to any liens

of Delaware County, Preston Hollow, or the Indenture Trustee. *Id.* at ¶¶ 92–98. In Counts II

(Breach of Contract) and III (Specific Performance), the City seeks entry of an order finding the

Indenture Trustee liable for breach of contract and directing the Indenture Trustee to transfer the

Prepetition Excess Funds to the City. *Id.* at ¶¶ 99–108. In Counts IV and VI (To Determine

Validity, Priority, and Extent of Lien), the City seeks entry of an order stating that the Indenture

Trustee, Preston Hollow, and Delaware County (collectively, "Creditor Defendants") do not have

valid and perfected security interests in the Pledged Revenues. *Id.* at ¶¶ 109–115, 121–127. In

Counts V and VII (Avoidance of Lien), the City seeks entry of an order avoiding the Creditor

Defendants' alleged security interests in the Pledged Revenues pursuant to § 544(a) of the

---

[7] Harrah's, Covanta, and the Finance Authority have since been dismissed as defendants to this adversary
proceeding. *See* Case No. 22-84 ECF 63, ECF 87.

Bankruptcy Code. *Id.* at ¶¶ 116–120, 128–131. In Count X (Preliminary and Permanent

Injunction), the City seeks related injunctive relief. *Id.* at ¶¶ 142–147.

Pursuant to an Amended Stipulation and Consent Order which was entered on February

21, 2023, the Indenture Trustee distributed $1,000,000 of the Prepetition Excess Funds to the

City and $2,000,000 to Preston Hollow, Delaware County, and the Finance Authority. Case No.

22-84 ECF 58. The remaining Prepetition Excess Funds, $1,445,242.41, are currently being held

in trust by the Indenture Trustee and are the subject of this dispute. Bond Parties' St. of

Undisputed Facts ¶ 24.

On August 14, 2023, the City moved for summary judgment on all counts stated in the

Second Amended Complaint ("City's Motion for Summary Judgment"). Case No. 22-84 ECF

97. Also on August 14, 2023, defendants Preston Hollow and the Indenture Trustee (collectively,

"Bond Parties") filed a joint motion for summary judgment with respect to Counts I through V

and X ("Bond Parties' Summary Judgment Motion"), and Delaware County filed a motion for

summary judgment with respect to Counts I, VI, VII, and X ("Delaware County Summary

Judgment Motion"). Case No. 22-84 ECF 99; ECF 101.

## III.    DISCUSSION

### A.  Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a) ("Rule 56"), applicable to bankruptcy

adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, "[t]he court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." "A genuine issue of material fact

is one in which sufficient evidence exists that would permit a reasonable fact finder to return a

verdict for the non-moving party." *Odom v. Philadelphia Parking Auth. (In re Odom)*, 571 B.R. 687, 692 (Bankr. E.D. Pa. 2017). As explained by Rule 56(c)(1)(A)-(B):

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Rule 56(c)(3) provides that "[t]he court need consider only the cited materials, but it may consider other materials on the record."

If the movant is the party with the burden of proof at trial, the movant "must produce enough evidence to justify a directed verdict in its favor in order to meet its initial burden." *In re Odom*, 571 B.R. at 693. If the movant is the defendant or the party without the burden of proof, "the movant must demonstrate the absence of a genuine issue of material fact, but the movant is not required to support the motion with affidavits or other materials that negate the opponent's claim. Rather, the movant may assert that the party with the burden of proof has not come forward with evidence to support one or more elements of its claim." *Green v. Didio (In re Didio)*, 607 B.R. 804, 808 (Bankr. E.D. Pa. 2019) (citations omitted). Once the movant satisfactorily meets its initial burden, the non-moving party must generally go beyond the pleadings and counter with evidence designating specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *DiSantis v. Morgan Props. Payroll Servs., Inc.*, Civ. Act. No. 09–6153, 2010 WL 3606267, at *4 (E.D. Pa. Sept. 16, 2010).

Ultimately, in resolving a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party. *In re Odom*, 571 B.R. at 692. The standard for resolving motions for summary judgment does not change when the parties file cross-motions. *Benckini v. Hawk*, 654 F. Supp. 2d 310, 315 (E.D. Pa. 2009).

Both the City and the Creditor Defendants agree that there are no issues of material fact needing resolution, so this adversary proceeding can be determined on summary judgment.

### B. The Trust Indenture obligates the Indenture Trustee to transfer the remaining Prepetition Excess Funds to the City.

In Counts II and III, the City asserts that the Indenture Trustee breached Section 5.02(e) of the Trust Indenture when it failed to transfer the Prepetition Excess Funds to the City prior to the Petition Date. Second Am. Compl. ¶¶ 99–108. In response, the Indenture Trustee argues that its conduct with respect to the Prepetition Excess Funds was proper, and that the City is only entitled to receive Excess Funds when the City requests transfer of such funds in writing, which was not done prior to the Petition Date.[8] Case No. 22-84 ECF 125-1 ("Bond Parties' Memo. of Law in Supp. of Mot. for Summ. Judg.") 28. Ultimately, the Court agrees with the City that the Trust Indenture plainly requires the Indenture Trustee to turn over the Prepetition Excess Funds to the City.

The Trust Indenture provides that the laws of the Commonwealth of Pennsylvania shall govern the construction of the contract. Trust Indenture § 13.03. Under Pennsylvania law, "[t]he fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties." *In re Garman*, 413 B.R. 215, 222 (Bankr. E.D. Pa. 2009) (quoting *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001)). Courts applying Pennsylvania law use the "plain meaning rule" of contract interpretation, which

---

[8] The Indenture Trustee also argued that the four-year statute of limitations for breach of contract claims had expired for Counts II and III. The Court disagrees. Under Pennsylvania law, the statute of limitations for breach of contract claims is four years. 42 PA. C.S.A. § 5525(a)(8). The limitations period begins to run when the contract is breached. *Romeo & Sons, Inc. v. P.C. Yezbak & Son, Inc.*, 652 A.2d 830, 832 (Pa. 1995). Furthermore, "where a contract calls for periodic or installment payments, a separate and distinct cause of action accrues with each failure to make payment." *Total Control, Inc. v. Danaher Corp.*, 359 F. Supp. 2d 387, 391 (E.D. Pa. 2005). Here, the City alleges that the Indenture Trustee failed to transfer the Excess Funds that it held as of the Petition Date to the City. The earliest the City could have brought its claim was in the fall of 2022, when the amount held in the Sinking Fund Accounts exceeded the amount due on February 15, 2023. As such, the City's claim is well within the four-year limitations period.

assumes that the intent of the parties is "embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Hullett v. Towers, Perrin, Forster & Crosby, Inc*., 38 F.3d 107, 111 (3d Cir. 1994) (quoting *County of Dauphin v. Fidelity & Deposit Co.,* 770 F. Supp. 248, 251 (M.D. Pa. 1991), *aff'd*, 937 F.2d 596 (3d Cir. 1991)). A contract is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Purdy v. Purdy*, 715 A.2d 473, 475 (Pa. Super. Ct. 1998). "A contractual term is not ambiguous, however, if the term can only mean one thing." *In re Garman*, 413 B.R. at 222.

As such, the Court's analysis begins with the express language of the Trust Indenture. Section 5.02 of the Trust Indenture outlines the Indenture Trustee's obligations with respect to the Pledged Revenues. The Indenture Trustee is required to periodically transfer the Excess Funds to the City pursuant to Section 5.02(e), which provides:

> <u>Transfer to the City</u>. Once the amounts on deposit in the Sinking Fund Accounts equal the principal and interest due on the 2017 Bonds on the next succeeding Interest Payment Date (including any amounts due and owing from prior Interest Payment Dates), any Pledged Revenues or other funds deposited in the Revenue Fund or any account thereof shall be transferred to the City to an account specified in writing thereby. Beginning on each next succeeding Interest Payment Date, the Trustee shall apply Pledged Revenues as set forth in paragraphs (a) through (d) above until this paragraph (e) is again applicable.

The Indenture Trustee's obligations under Section 5.02(e) of the Trust Indenture are clear and unambiguous. Once the amounts held in the Sinking Fund Accounts are sufficient to pay the principal and interest due on the 2017 Bonds on the next succeeding Interest Payment Date, "any Pledged Revenues or other funds deposited in the Revenue Fund or any account thereof *shall be transferred to the City* to an account specified in writing thereby." Trust Indenture § 5.02(e) (emphasis added). It is undisputed that, as of the Petition Date, the amounts held in the Sinking Funds Accounts exceeded the amount required to pay the principal and interest due on the 2017

Bonds on February 15, 2023, the next Interest Payment Date. *See* City Memo. of Law in Supp. of

Mot. for Summ. Judg. 9; Bond Parties' St. of Undisputed Facts ¶ 24. As such, the Indenture

Trustee was obligated – and remains obligated – to transfer the Prepetition Excess Funds to the

City.

The Bond Parties argue that the Indenture Trustee is *only* obligated to transfer Excess

Funds to the City pursuant to Section 5.02(e) if and when the City "requests" return of the funds

in writing. Bond Parties' Memo. of Law in Supp. of Mot. for Summ. Judg. 28. There is simply

nothing in the express language of the Trust Indenture that purports to require the City to

"request" the release of Excess Funds. Section 5.02(e) provides only one clear precondition to

the Indenture Trustee's obligation to transfer any Excess Funds to the City – that the amounts

held in the Sinking Fund Accounts are sufficient to pay the principal and interest due on the 2017

Bonds on the next succeeding Interest Payment Date. The Trust Indenture provides in clear terms

that "once*"* this condition is satisfied, such funds "shall be" transferred to the City. Trust

Indenture § 5.02(e). The first sentence of Section 5.02(e) can only reasonably be interpreted as

requiring the Indenture Trustee to transfer any Excess Funds to the City *as soon as* the Sinking

Fund Accounts are sufficiently funded to pay the principal and interest due on the 2017 Bonds on

the next Interest Payment Date.

Prior to the Petition Date, the Indenture Trustee would typically contact the City when

Excess Funds were available and ask the City to provide a direction letter specifying the account

where the Excess Funds should be Sent. *See* City Memo. of Law in Supp. of Mot. for Summ.

Judg. 8–9. The City always provided the requested written direction, and the Indenture Trustee

would then transfer the Excess Funds to the City. *Id.* Based on this "course of performance," the

Indenture Trustee attempts to read conditions precedent into the City's entitlement to receive the

Excess Funds that simply do not appear in the Trust Indenture itself. *See* Bond Parties' Memo. of

Law in Supp. of Mot. for Summ. Judg. Part V.B. Section 5.02(e) places the obligation on the

party with access to the funds – the Indenture Trustee – to transfer the Excess Funds to the City.

The Indenture Trust does not make the City's entitlement to the Excess Funds dependent upon

the City following a certain procedure for obtaining the funds. Under Pennsylvania law,

"[l]anguage not clearly written as a condition precedent is presumed not to be, unless the

contrary clearly appears to be the intention of the parties." *Mellon Bank, N.A. v. Aetna Bus.*

*Credit, Inc.*, 619 F.2d 1001, 1016 (3d Cir. 1980). *See also In re Dairy Consulting, Inc.,* 386 B.R.

135, 155 (Bankr. W.D. Pa. 2008). As such, that the City did not initiate a request for the Excess

Funds before the Petition Date simply has no bearing on its entitlement to the Prepetition Excess

Funds clearly reflected in the Trust Indenture. Accordingly, the Court finds that the Indenture

Trustee must transfer the Prepetition Excess Funds to the City. An order consistent with this will

follow.

### C. The Creditor Defendants' security interests in the Pledged Revenues are properly perfected under Pennsylvania law.

The City next attempts to avoid the Creditor Defendants' liens on the Pledged Revenues,

arguing first that the Creditor Defendants' security interests in the Pledged Revenues are not

properly perfected and as such, the City may avoid those liens pursuant to § 544 of the

Bankruptcy Code. City Memo. of Law in Supp. of Mot. for Summ. Judg. at 19-22.

Specifically, the City argues that the Creditor Defendants do not have perfected security

interests under the Local Government Unit Debt Act ("Debt Act"), 53 PA. C.S.A. § 8001 *et seq.*,

or under the Pennsylvania Uniform Commercial Code ("Pa. UCC"), 13 PA. C.S.A. § 1101 *et*

*seq.*, in any of the Pledged Revenues not in the Creditor Defendants' possession because the

Pledged Revenues are "money," meaning that perfection can only occur by possession, rendering

the Financing Statements insufficient to perfect the Creditor Defendants' security interests in the Pledged Revenues. City Memo. of Law in Supp. of Mot. for Summ. Judg. 18-19; Case No. 22-84 ECF 107 ("Opp. to Defendant's Mot.") 16. *See* 13 PA. C.S.A. § 9312(b)(3). In particular, according to the City, the Creditor Defendants lack actual or constructive possession of any "Revenues received or to be received after the Petition Date," "any Revenues that may have been generated by the Payors before the Petition Date," and "any Revenues not yet paid by the Payors." City Memo. of Law in Supp. of Mot. for Summ. Judg. 19-20. As such, the City argues that the Financing Statements are insufficient to perfect their security interests in those Pledged Revenues. *Id.*

The Creditor Defendants maintain that they have sufficiently perfected their security interests in the Pledged Revenues, as the Pledged Revenues are classifiable as "general intangibles" or "accounts," and any security interest in such collateral can be perfected by the filing of a financing statement. Bond Parties' Memo. of Law in Supp. of Mot. for Summ. Judg. 12–13; Case No. 22-84 ECF 101-2 ("Del. Co. Memo. of Law in Supp. of. Mot. for Summ. Judg.") 8–9. Therefore, the Creditor Defendants argue their properly filed Financing Statements perfected their security interests in the Pledged Revenues under both the Debt Act and the Pa. UCC. Bond Parties' Memo. of Law in Supp. of Mot. for Summ. Judg. 11, 13; Del. Co. Memo. of Law in Supp. of. Mot. for Summ. Judg. 8-9.

First, the Court agrees with the Creditor Defendants that the Pledged Revenues are more akin to an "account" or "payment intangible" than "money" for purposes of perfection. As the Trust Indenture states, the Pledged Revenues are revenues "payable to or to be received by the [City]" over the course of ten years. *See* Trust Indenture § 1.03. Had the drafters of the Trust Indenture only meant to capture money *actually received*, they would have eliminated "to be"

and simply defined the Pledged Revenues as amounts "received." *See* Case No. 22-84 ECF 110 Bond Parties' Memo in Opp. to Chester 20. Additionally, subpart (ii) of the "Revenues" definition in the Trust Indenture "includes 'moneys' that are actually received and held by the Trustee." *Id.* The Court agrees with the Bond Parties that if "Pledged Revenues were only money received, then such amounts would be the exact same 'moneys' referred to in subpart (ii)," effectively rendering subpart (ii) "superfluous and unnecessary." *Id.* Ultimately, because the Pledged Revenues are those revenues "payable to or to be received by the [City][,]" Trust Indenture § 1.03, they constitute "payment intangibles" and, by extension, "general intangibles" under the Pa. UCC, analogous also to an "account" as the Trust Indenture gives the Bond Parties a security interest in a right to payment of a monetary obligation through 2027. *See* 13 PA. C.S.A. § 9102.

The same applies to Delaware County's security interest in the Harrah's Revenues, as nowhere does the Contribution Agreement limit Delaware County's security interest to solely Harrah's Revenues received. *See* Contribution Agreement. In fact, the 2009 Financing Statement specifically describes Delaware County's collateral as "[a]ll of [the City's] right, title and interest in and to host community payments under § 1403(c)(iii) of the Pennsylvania Race Horse and Development Gaming Act, 4 PA. C.S.A. § 1101, *et seq.*, *paid or payable* in connection with the operation by Chester Downs and Marina, LLC of a harness racing and casino facility in Chester, Pennsylvania…in accordance with the provisions of the Contribution Agreement dated as of February 15, 2009, by and between the [City] and [Delaware County]." Case No. 22-84 ECF 101-8, Ex. A-5 (emphasis added). As such, Delaware County's security interest in the Harrah's Revenues is most akin to a payment intangible or account as well.

14

Having determined that the Pledged Revenues constitute a payment intangible or account, the Court must consider the applicable manner of perfection under Pennsylvania law. Pursuant to § 9109(c)(2) of the Pa. UCC, Title 13 of the Pennsylvania Code does not apply to the extent that "another statute of this Commonwealth expressly governs the creation, perfection, priority or enforcement of a security interest created by the Commonwealth or a governmental unit of the Commonwealth[.]" 13 PA. C.S.A. § 9109(c)(2). Here, the Debt Act governs the creation and perfection of security interests created by governmental units. Under § 8147 of the Debt Act:

> [t]he governing body of any local government unit which has determined to issue any revenue bonds or notes or any guaranteed revenue bonds or notes may provide by ordinance for such pledges of or priorities in such rentals, revenues, receipts, rates and charges to be received from projects of the issuing local government unit as may be desirable. The pledge or priority shall be perfected as a security interest against all creditors of the local government unit and all third parties, in accordance with the terms of the ordinance, from and after the filing of a financing statement or statements in accordance with Title 13 (relating to commercial code).

53 PA. C.S.A. § 8147.

The Financing Statements providing the name of the debtor, the name of the secured party, and a description of the collateral, properly perfected the Creditor Defendants' security interests in the Pledged Revenues under § 8147 of the Debt Act.[9]

### D. The Creditor Defendants hold consensual, not statutory, liens against the Pledged Revenues.

Next, the City seeks a declaration, per Count I, that pursuant to § 552(a) of the Bankruptcy Code, the Pledged Revenues are no longer subject to the Creditor Defendants' liens. City Memo. of Law in Supp. of Mot. for Summ. Judg. 22–23.

---

[9] Alternatively, in the event that the Debt Act does not govern, the Financing Statements still properly perfected those security interests in the Pledged Revenues under the Pa. UCC because security interests in general intangibles can be perfected by the filing of a financing statement. *See* 13 PA. C.S.A. § 9310(a).

Pursuant to § 552(a) of the Bankruptcy Code, "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." Section 552(a) thus establishes a "general rule ... that property acquired by the bankruptcy estate post-petition is not subject to any lien resulting from a pre-petition security agreement." *Fin. Oversight & Mgmt Bd. v. Andalusian Glob. Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 385 F. Supp. 3d 138, 148 (D.P.R. 2019), *aff'd*, 948 F.3d 457 (1st Cir. 2020). The Creditor Defendants argue that § 552(a) does not apply because they have statutory liens on the Pledged Revenues as opposed to consensual liens stemming from a security agreement.

Pursuant to § 101(53) of the Bankruptcy Code, a "statutory lien" is defined as a

> lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute.

Congress explained that "the concept of lien is divided into three kinds of liens: judicial liens, security interests, and statutory liens. *Those three categories are mutually exclusive* and are exhaustive except for certain common law liens." S. REP. NO. 95-989, 95th Cong., 2d Sess. 26 (1978); H.R. REP. 95-595, 95th Cong., 1st Sess. 313-14 (1977) (emphasis added). Therefore, the Creditor Defendants' liens can only be classified as either a statutory lien or a consensual lien. *See In re Griggs*, 12 B.R. 443, 444 (Bankr. E.D. Pa. 1981) (citing to the Senate Report 95-989 and House Report 95-595 issued in connection with the Bankruptcy Reform Act to resolve a dispute about the nature of a lien and finding that two categories of liens could not mutually exist with respect to the same subject matter). *See also In re Jones*, 13 B.R. 945, 947 (Bankr. E.D. Pa. 1981).

Pursuant to § 6 of the 2017 Ordinance:

> Pledge of, and Security Interest in, Pledged Revenues. The City hereby irrevocably pledges the Pledged Revenues for the payment of the principal of, premium, if any, and interest on the Bonds and grants a security interest in and to all such Pledged Revenues which shall be perfected as provided in the [Debt] Act and the Pennsylvania Uniform Commercial Code (the 'UCC'), as applicable, for the benefit and security of the Trustee … on behalf of the owners of the Bonds. The Trustee is hereby authorized to file a financing statement under the UCC reflecting the foregoing pledge and security interest. Such pledge and security interest shall be subject, as appropriate, to those existing pledges and security interests securing existing obligations of the City described in the recitals hereto.

2017 Ordinance § 6.

The Bond Parties argue that the foregoing language expressly granted a lien in the Pledged Revenues to be perfected by the Indenture Trustee pursuant to authority conferred upon the Indenture Trustee vis-à-vis the 2017 Ordinance and, therefore, the liens held by the Bond Parties are statutory liens. Case No. 22-84 ECF 110 Bond Parties' Memo in Opp. to Chester 15–16. However, as the City argues, § 17 of the 2017 Ordinance indicates that the liens at issue did not arise solely by statute and specifically references the consensual security interest held by the Bond Parties. Section 17 of the 2017 Ordinance provides:

> Trust Indenture. The City hereby authorizes the execution and delivery of an indenture of trust (the 'Trust Indenture') with U.S. Bank National Association, as trustee (the 'Trustee') *under which the Bonds will be issued and secured*, and the Sinking Funds held. The Trust Indenture may set forth any provisions regarding the Bonds described in Section 8148 of the Act, including, without limitation, provisions limiting the ability of the City to issue additional debt secured by the Pledged Revenues, provisions regarding the collection and deposit of any Pledged Revenues and provisions regarding establishment of any reserve funds. The Mayor or Deputy Mayor of the City is hereby authorized and directed to execute and deliver, and the City Clerk to attest, the Trust Indenture, and to approve the terms and forms thereof, such approval to be evidenced by such officer's execution thereof.

2017 Ordinance § 17 (emphasis added).

The Court agrees with the City that the 2017 Ordinance, read comprehensively, does not create a statutory lien. As stated earlier, a statutory lien is a "lien arising *solely* by force of a

statute on specified circumstances or conditions[.]" 11 U.S.C. § 101(53) (emphasis added).

Section 17 of the 2017 Ordinance explicitly recognizes that the Pledged Revenues are "issued

and secured" by the Trust Indenture. Accordingly, the liens held by the Bond Parties did not arise

*solely* under the 2017 Ordinance because the 2017 Ordinance clearly acknowledges the Bond

Parties' consensual security interest created under the Trust Indenture.

The Trust Indenture defines the form and term of the 2017 Bonds, issue of obligations

owed, redemption of the 2017 Bonds, the collateral securing payment of the 2017 Bonds, and all

other key characteristics of the transaction. *See* Trust Indenture §§ 2.01, 3.01-.03, 7.01-.05. As

such, the efficacy of the 2017 Ordinance is wholly dependent on the existence of the Trust

Indenture. Analogizing the Bond Parties' lien to condominium association liens is instructive. The

Court finds particularly persuasive the position expressed by the Bankruptcy Court for the District

of New Jersey in *In re Lynch,* 630 B.R. 745 (Bankr. D. N.J. 2021), addressing how condominium

association liens should be categorized under the Bankruptcy Code when such liens are identified

in a statute and a consensually executed master deed. The court in that case found that the

relationship between the master deed and the statute was determinative — the statute had no

efficacy without the master deed, which had created a consensual lien, and therefore "by

Bankruptcy Code definition, a Condo Lien [could not] be statutory, because it [did] not arise solely

by statute." *Id.* at 757. Consequently, the *In re Lynch* court found that the lien had to be classified

as a consensual lien. *Id*.

Like in *In re Lynch,* the relationship between the 2017 Ordinance and the Trust Indenture

is determinative here. Though the 2017 Ordinance governs aspects of the lien, it is "entirely

reliant" on the underlying Trust Indenture and would have no operative force without it. *See In re*

*Lynch*, 630 B.R. at 756–57. The lien is a product of voluntary and consensual agreement — by

Bankruptcy Code definition, it is therefore a consensual lien derived from a security agreement even if a statute or ordinance governs aspects of the lien. 2 COLLIER ON BANKRUPTCY ¶ 101.53 (16th ed.); H.R. REP. NO. 595, 95th Cong., 1st Sess. 314 (1977). Consequently, the lien does not satisfy the § 101(53) definition of a "statutory lien," as the lien did not arise *solely* by statute as required by § 101(53) given that the consensual security interest under the Trust Indenture is identical to the statutory lien purportedly granted under the 2017 Ordinance; and the 2017 Ordinance is dependent on the actual terms outlined in the Trust Indenture.

Delaware County also asserts that the 2009 Ordinance, enacted by the City "to incur debt and contribute funds to the County for construction of the soccer stadium," created a statutory lien on the Harrah's Revenues. Del. Co. Memo. of Law in Supp. of. Mot. for Summ. Judg. at 2-3. Delaware County relies upon the Bond Parties' arguments, detailed above, as support for why the 2009 Ordinance creates a statutory lien. Del. Co. Memo. of Law in Supp. of. Mot. for Summ. Judg. 7; Case No. 22-84 ECF 112 ("Del. Co. Resp. in Opp. to Chester") 3-4. The City responds that Delaware County's lien on the Harrah's Revenues arises from the Contribution Agreement. City Memo. of Law in Supp. of Mot. for Summ. Judg. 24. The Contribution Agreement was voluntary and consensual, which is contrary to the creation of statutory liens which arise without consent or judicial action. Opp. to Defendant's Mot. 16.

The Court agrees with the City that Delaware County holds a consensual lien in the Harrah's Revenues. The 2009 Ordinance specifically provides that "the City has determined and agreed to make a contribution to the County to fund the City Share, in accordance with the terms and provisions of a Contribution Agreement, to be dated as set forth therein ('Contribution Agreement') between the County and the City." Case No. 22-84 ECF 101, Ex. A-1. at 3 ¶ 5. As with the 2017 Ordinance, this language in the 2009 Ordinance indicates that the 2009 Ordinance

is built upon the Contribution Agreement, which is voluntary and consensual in nature and inherently contrary to the form of statutory liens. *See* 11 U.S.C. § 101(53). While the 2009 Ordinance and the Contribution Agreement work together, the Ordinance's operative force is inherently dependent upon the substance of the Contribution Agreement; the Ordinance could not stand alone. *See In re Lynch*, 630 B.R. at 758 (holding that the relationship between two documents claimed to have created the same lien is determinative of the nature of the lien).

The Contribution Agreement operates to create a voluntary and consensual lien. In the same fashion as the Bond Parties' Trust Indenture, the Contribution Agreement details the form and nature of the City's payment pledge to Delaware County, serves as the security agreement pledging the Harrah's Revenues to Delaware County, and includes a schedule of contribution payments to be made by the City. *See* Contribution Agreement Art. 3, Art. 4, Sch. A. As such, it is apparent the efficacy of the 2009 Ordinance is dependent upon the existence of the Contribution Agreement, making clear that Delaware County's lien on the Harrah's Revenues arises from a consensual security agreement.

Accordingly, unless an exception applies, the Creditor Defendants' liens in the Pledged Revenues are subject to § 552(a) of the Bankruptcy Code.

E. **Because the Pledged Revenues do not constitute proceeds, products, offspring, or profits derived from prepetition property, § 552(b)(1) does not apply to except the Creditor Defendants' liens against the Pledged Revenues from § 552(a).**

Section 552(b)(1) provides a narrow exception to § 552(a), stating that:

> [e]xcept as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided

by such security agreement and by applicable nonbankruptcy law, except to any
extent that the court, after notice and a hearing and based on the equities of the
case, orders otherwise.

"By virtue of this exception, 'if a security agreement entered before the commencement of the

case extends 'to proceeds, product, offspring or profits' of the original collateral, then the

security interest continues to apply to the proceeds and so on, even when they are acquired by the

debtor or estate after the bankruptcy case begins.'" *In re Fin. Oversight & Mgmt. Bd. for Puerto*

*Rico,* 385 F. Supp. 3d at 148.

The Creditor Defendants argue that their liens against the Pledged Revenues survive as

interests in "proceeds" pursuant to § 552(b)(1). Case No. 22-84 ECF 126 ("Bond Parties' Opp. to

Chester Mot. for Summ. Judg.") 26. They assert that their lien extends to the City's present right

to future amounts "to be received" from the Pledged Revenues, which constitutes prepetition

property, and that the ultimate payment and receipt of the Revenues constitute "proceeds" from

the Pledged Revenues. *Id.* Consequently, any actual receipt of those Revenues should be

considered "proceeds" from the Pledged Revenues. *Id.* The City asserts that the Pledged

Revenues are not "proceeds" subject to § 552(b)(1) because they do not meet the Pa. UCC's

definition of "proceeds." Case No. 22-84 ECF 124 ("Chester Omnibus Opp.") 23. The Pa. UCC

defines proceeds as "whatever is collected on or distributed on account of collateral." 13 Pa.

C.S.A. § 9102. The City contends that the Pledged Revenues cannot constitute proceeds of other

collateral in which the Creditor Defendants hold a security interest. Chester Omnibus Opp. 23.

Rather, the Pledged Revenues themselves are the collateral in which the Creditor Defendants

hold a security interest. *Id.* at 23-24.

The City also observes that, even if the Pledged Revenues were considered proceeds,

bankruptcy courts have largely found that payments to a debtor generated from postpetition acts

of a third party constitute proceeds of postpetition property rather than prepetition property,

making § 552(b)(1) inapplicable to such payments. Chester Omnibus Opp. 24. The City explains

that its right to payment of the Pledged Revenues is dependent on the postpetition acts of third

parties, including Covanta and Harrah's. *Id.* at 25. Specifically, the amount of Host Community

Revenues and Harrah's Revenues the City receives is dependent on the amount of waste

collected by Covanta and the volume of activity at Harrah's following the Petition Date. *Id.*

Because the right to these payments is contingent on and only arises from the postpetition acts of

others, the payments would, at most, be considered proceeds of postpetition property. *Id.*

In determining whether § 552(b)(1) applies, the Court must first consider what constitutes

"proceeds." The Pa. UCC defines "proceeds" to include "whatever is collected on or distributed

on account of collateral." 13 PA. C.S § 9102. Applied here, the Creditor Defendants' collateral

quite simply is the Pledged Revenues themselves, which are not capable of producing

identifiable proceeds to be collected on account of those revenues. The Creditor Defendants'

comparison of its security interests in the Pledged Revenues to "dividends paid on stock" is

distinguishable. *See* Bond Parties' Memo. of Law in Supp. of Mot. for Summ. Judg. 22. In that

analogy, a party holds a security interest in the stock itself, something that already exists, and the

dividends are the proceeds of that stock. Unlike the Pledged Revenues, a stock is a type of

collateral that can produce proceeds. Likewise, if a debtor pledges its prepetition patents to

secure a debt, royalties received by the debtor postpetition could attach under § 552(b) because

the royalties would be proceeds of the prepetition intellectual property. Here, in contrast, the

only collateral that exists is the Pledged Revenues, and there are no proceeds which are

subsequently produced. *See In re Froid*, 109 B.R. 481, 484 (Bankr. M.D. Fla. 1989) (finding that

the security interest granted to the debtor was in the renewal commissions itself and thus any

renewal commissions paid to the debtor postpetition were not "proceeds" to which lien of FDIC

could attach).[10]

Based on the foregoing, the § 552(b) proceeds exception does not apply to the Pledged

Revenues.

### F.   Because none of the Pledged Revenues are "special revenues," § 928 does not except the Pledged Revenues from § 552(a).

The Creditor Defendants argue that, even if the Pledged Revenues are not considered

"proceeds" under § 552(b), some of the Pledged Revenues stem from excise taxes and therefore

constitute "special revenues," exempt from § 552(a). *See* Bond Parties' Memo. of Law in Supp.

of Mot. for Summ. Judg. 23–27.

Pursuant to § 928(a), "[n]otwithstanding section 552(a) of this title…special revenues

acquired by the debtor after the commencement of the case shall remain subject to any lien

resulting from any security agreement entered into by the debtor before the commencement of

the case." In pertinent part, § 902(2)(B) defines "special revenues" to include "special excise

taxes imposed on particular activities or transactions[.]" The Bankruptcy Code does not define

what constitutes an "excise tax," leaving courts to look to federal law defining what constitutes a

"tax." *In re Metro Transp. Co.,* 117 B.R. 143, 151 (Bankr. E.D. Pa. 1990) (holding that payments

for workmen's compensation insurance premiums due under the Pennsylvania Workmen's

---

[10] Alternatively, even if the Pledged Revenues are considered "proceeds," the Court would agree that those proceeds would be "generated by the post-petition acts of a third-party." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,* 385 F. Supp. 3d at 149 (holding that employer contributions that the Employee Retirement System (ERS) received postpetition did not constitute the "proceeds" of ERS's prepetition right to receive such contributions in the future). The future receipt of Pledged Revenues necessarily depends on future payments from Covanta and Harrah's, which depend in turn on the amount of waste collected by Covanta and the volume of activity conducted at Harrah's following the Petition Date. Case No. 22-84 ECF 125-2 Bond Parties' St. of Undisputed Facts ¶¶ 11-13. Thus, the right to payment of the Pledged Revenues is contingent upon and only arises from the postpetition acts of others, and any proceeds from that right would constitute proceeds of postpetition property. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,* 385 F. Supp. 3d at 150.

Compensation Act were not "excise taxes" but "charges"). Although not binding or

determinative, state law definitions of what constitutes a "tax" may be persuasive as well. *Id.*

The Creditor Defendants argue that the Harrah's Revenues and Harrah's Table Game

Revenues constitute excise taxes. *See* Bond Parties' Memo. of Law in Supp. of Mot. for Summ.

Judg. 23–27. As mentioned, the Harrah's Revenues are "revenues payable or to be received by

the City from the Facility in accordance with § 1403(c)(3)(iii) of the Gaming Act." Trust

Indenture § 1.03. Under 4 PA. C.S.A. § 1403(c)(3)(iii):

> [t]he department [of Revenue of the Commonwealth] shall:…
>
> (3) From the slot machine license operation fees deposited into the fund under
> section 1326.1(e) (relating to slot machine license operation fee), make quarterly
> distributions among the municipalities, including home rule municipalities,
> hosting a licensed facility in accordance with the following schedule:
>
> …
>
> (iii) To a city of the third class hosting a licensed facility, other than a Category 3
> or Category 4 licensed facility, $10,000,000 annually, less any amount up to
> $5,000,000 received pursuant to a written agreement with a licensed gaming
> entity executed prior to the effective date of this part, shall be distributed to the
> city, subject, however, to the budgetary limitation in this subparagraph. In the
> event that the city has a written agreement with a licensed gaming entity executed
> prior to July 5, 2004, the amount paid under the agreement to the city shall be
> applied and credited, up to $5,000,000, to the slot machine license operation fee
> owed under section 1326.1. The amount allocated to the designated municipalities
> shall not exceed 50% of their total budget for fiscal year 2003-2004, adjusted for
> inflation in subsequent years by an amount not to exceed an annual cost-of-living
> adjustment calculated by applying the percentage change in the Consumer Price
> Index immediately prior to the date the adjustment is due to take effect. Any
> remaining moneys shall be distributed in accordance with paragraph (2) based
> upon the classification of county where the licensed facility is located.

Under 4 PA.C.S.A. § 1326.1, titled "Slot machine license operation fee:"

> (a) Imposition. – Beginning January 1, 2017, the board shall impose an annual
> slot machine license operation fee on each Category 1 and Category 2 licensed
> gaming entity in an amount equal to 20% of the slot machine license fee paid
> at the time of issuance under section 1209(a) (relating to slot machine license
> fee).

24

. . .

(d) Failure to pay. – The board may at its discretion suspend, revoke or deny a permit or license issued under this part if a Category 1 or Category 2 licensed gaming entity fails to pay the slot machine license operation fee imposed under subsection (a).

(e) Deposit of slot machine license operation fee. – The total amount of all slot machine license operation fees imposed and collected by the board under this section shall be deposited in the fund and shall be appropriated to the department on a continuing basis for the purposes under section 1403(c)(3) and (4).

The Harrah's Table Game Revenues are "revenues payable or to be received by the City from the table games at the Facility in accordance with §13A63(c)(2) of the Gaming Act." Trust Indenture § 1.03. Under 4 PA. C.S.A. § 13A63, titled "Local share assessment:"

(a) Required payment. – In addition to the tax imposed under section 13A62 (relating to table game taxes), each certificate holder shall pay on a weekly basis and on a form and in a manner prescribed by the department a local share assessment into a restricted receipts account established with the fund…
…
(c) Distributions to municipalities. – The department shall make quarterly distributions from the local share assessments deposited into the fund under subsection (a) to municipalities, including home rule municipalities, hosting a licensed facility authorized to conduct table games under this chapter in accordance with the following:

…

(2) If the licensed facility is a Category 1 licensed facility located at a harness racetrack in a city of the third class, 50% of the licensed facility's local share assessment shall be distributed to the city for the purpose of making payments to enable the city and other municipalities in the school district in which the city is located to become and remain local sponsors or members of a community college. Payments may include initial buy-in costs, including payment of debt service to fund the initial buy-in, and annual local sponsor share payments to the community college. Any funds remaining following the payment of all local sponsorship, membership and other costs authorized under this paragraph may be retained by the city and used for any lawful purpose.

25

Federal courts have articulated a number of tests for determining whether an obligation constitutes a "tax" as opposed to a "fee" or a "debt." For example, the Sixth Circuit Court of Appeals ("Sixth Circuit") has stated that "the chief distinction is that a tax is an exaction for public purposes while a fee relates to an individual privilege or benefit to the taxpayer." *United States v. River Coal Co.*, 748 F.2d 1103, 1106 (6th Cir. 1984). In further explanation, the Sixth Circuit elaborated:

> Congress may impose a tax without regard to the benefits bestowed on the taxpayer, considering only the need for revenue to fund the government's public functions. 'A fee, however, is incident to a voluntary act, *e.g.,* a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing these services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.' The test has been variously stated, but the chief distinction is that a tax is an exaction for public purposes while a fee relates to an individual privilege or benefit to the payer.

*Id.* (internal citations omitted).

The Third Circuit Court of Appeals similarly concluded that "a situation in which a payment is exchanged for a government benefit not shared by others indicates that the debt is not for a tax." *United Healthcare System, Inc. v. New Jersey Dept. of Labor (In re United Healthcare System, Inc.)*, 396 F.3d 247, 260 (3d Cir. 2005). Furthermore, as explained by the First Circuit Court of Appeals:

> [c]ourts have had to distinguish 'taxes' from 'regulatory fees' in a variety of statutory contexts. Yet, in doing so, they have analyzed the legal issues in similar ways. They have sketched a spectrum with a paradigmatic tax at one end and paradigmatic fee at the other. The classic 'tax' is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic 'regulatory fee' is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.

*San Juan Cellular Tel. Co. v. Public Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992) (internal citations omitted).

Ultimately, "[i]f the exaction is imposed by the legislature upon all, or almost all, of the citizens or property to accomplish a general public purpose, it is more likely to be a tax. If, on the other hand, the charge is imposed by a government agency on a specific subset of citizens or conduct subject to regulation by the agency and is set at such amount as to discourage certain conduct or defray the costs of the agency, it is a fee." *Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, 891 F. Supp. 2d 1058, 1065 (E.D. Wis. 2012), *aff'd*, 732 F.3d 837 (7th Cir. 2013).

On the scale of a tax to a fee, the Court finds the Harrah's Revenues and Harrah's Table Game Revenues much closer to fees than taxes. Although not dispositive, it is notable that Pennsylvania has specifically characterized the source of the Harrah's Revenues as a slot machine license operation *fee* and that a gaming entity's license is conditioned on payment of this fee, suggesting that the slot machine license operation fee is payment in exchange for a privilege not shared by others. This charge is only imposed on specific entities -- Category 1 and Category 2 licensed gaming entities -- rather than the general public. As such, the Harrah's Revenues are not a tax for purposes of § 928 of the Bankruptcy Code.

Although it is a closer call for the Harrah's Table Game Revenues, the Court ultimately concludes that this too does not constitute a tax for purposes of § 928 of the Bankruptcy Code. First, again, although not dispositive, it is notable that Pennsylvania distinguishes the source of the Harrah's Table Game Revenues, the local share assessment, from the "tax imposed under section 13A62 (relating to table game taxes)." 4 Pa. C.S.A. § 13A63. Additionally, the payment of this local share assessment ultimately relates to the individual privilege only applicable to

certain individual entities of holding a certificate to operate table games, making it more akin to a fee than a tax.[11]

### IV.    CONCLUSION

Based on the foregoing, the City's Motion for Summary Judgment is GRANTED. An order consistent with this Opinion follows.

Date: November 3, 2023

_____

Honorable Ashely M. Chan
United States Bankruptcy Judge

---

[11] To the extent the Bond Parties would argue that the Additional City Consideration is an excise tax, the Court does not agree. The Additional City Consideration simply cannot be an excise tax because payments due under a contract are debts—not excise taxes. *See In re Boston Reg'l Med. Ctr., Inc.*, 291 F.3d 111, 120 (1st Cir. 2002) ("[T]he Supreme Court has particularly distinguished a tax from a debt . . . . [A] debt is an obligation for the payment of money founded upon contract, express or implied." (citing *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906) (internal quotation marks omitted)). The Additional City Consideration is paid pursuant to a contract between the City and Harrah's which requires Harrah's to pay to the City "an amount equaling the amount of Additional City Consideration due for the preceding year, minus the total of the [monthly additional consideration payments] paid by Harrah's during the preceding year." Case No. 22-84 ECF 125-2 ¶ 13; ECF 125 Ex. A-8 § 2(d).